J-S27025-15
J-S27026-15

2015 PA Super 266

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF |
| --- | --- |
| Appellant | PENNSYLVANIA |
| v. | |
| SALEEM SHABEZZ | |
| Appellee | Nos. 1639 EDA 2014 AND |
| | 1702 EDA 2014 |

Appeal from the Orders Entered April 2, 2014 and May 15, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at Nos: CP-51-CR-0012538-2013 and CP-51-CR-0015450-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE,  and FITZGERALD, JJ.[*]

OPINION BY STABILE, J.:                    **FILED DECEMBER 21, 2015**

Appellant, the Commonwealth of Pennsylvania, appeals from the trial

court's April 2, 2014 and May 15, 2014 orders suppressing evidence.  We

affirm.

We begin with a review of the pertinent facts, as gleaned from the

transcript of the suppression hearing.[1]  Sergeant Michael Cerutti ("Sergeant

---

[*] Former Justice specially assigned to the Superior Court.

[1]  In reviewing a trial court's suppression decision, we must confine our
review to the transcript of the suppression hearing.  **In re L.J.**, 79 A.3d
1073, 1082-85 (Pa. 2014).  Given Appellee's success here, the case did not
proceed to trial and the suppression hearing transcript is the only one
available.

Cerutti"), a member of the narcotics enforcement team of the 15th District police department in the City of Philadelphia, testified that on June 1, 2013, he was overseeing a surveillance operation at the McDonald's restaurant at the intersection of Cottman and Roosevelt Boulevards in the City of Philadelphia. N.T. Hearing, 4/2/14, at 7-9. Surveillance commenced at 7:30 or 7:40 p.m. *Id.* at 11. Sergeant Cerutti has been involved in "hundreds of arrests" at that location and it has been a hot spot for at least three years. *Id.* at 9-10. He testified that participants in the transaction would commonly meet at the McDonald's and then travel to a nearby 7-11 to complete the exchange. *Id.* at 9-10. Sergeant Cerutti did not personally observe the transaction at issue in this case, but received reports from members of his team who were on the scene and gave the order to stop Appellee, Saleem Shabezz, and the other involved parties. *Id.* at 17-18.

Officer Steven Burgoon ("Officer Burgoon") testified that he observed Appellee engage in a drug transaction in the 7-11 parking lot. Officer Burgoon confirmed Sergeant Cerutti's testimony that many drug transactions occur at the location involved in this case. *Id.* at 21. On the evening in question, a member of the surveillance team informed Officer Burgoon that a tan Nissan was leaving the McDondald's. *Id.* at 22. Officer Burgoon and his partner, Officer James Wade ("Officer Wade"), followed the Nissan in their unmarked vehicle. *Id.* The Nissan drove from McDonald's to the 7-11 parking lot one block away. *Id.* at 22. Shortly thereafter, Officer

Burgoon observed a red Acura arrive in the 7-11 parking lot and park several spaces from the Nissan. *Id.* From his vantage point 45 feet away, Officer Burgoon observed Appellee emerge from the passenger side of the Acura, walk to the passenger side of the Nissan, open the passenger door, and engage in a hand-to-hand drug transaction with the Nissan's driver. *Id.* at 22-23. The suspected transaction occurred shortly after 8:00 p.m. *Id.* at 39, 48.

The trial court asked Officer Burgoon to explain why he believed he saw a hand-to-hand drug transaction. *Id.* at 22. Officer Burgoon explained:

> I saw [Appellee] reach in towards the driver, did like a cupping act. I did not see any USC [United States Currency] being exchanged, but I saw what I believed was a transaction because the hand movement was like a dropping—picking up and dropping action from [Appellee].
>
> THE COURT: Did you see what was dropped?
>
> [Officer Burgoon]: No. It was small objects it looked like.

*Id.* at 23. A written "PARS" report,[2] prepared shortly after the incident, stated only that Appellee opened the passenger door of the Nissan, leaned in, and had a conversation with the driver. *Id.* at 39. Officer Apostolu prepared the report based in part on a briefing from Officer Burgoon. *Id.* at

---

[2] The record does not define this acronym, but our understanding is that it refers to the Philadelphia Police Department arrest report.

40. Officer Burgoon did not mention any discrepancy to Officer Apostolu[3] when he first reviewed the report. *Id.* at 44.

After the transaction, Appellee proceeded back to the Acura, and both vehicles began to depart from the 7-11 parking lot. *Id.* at 22. Officer Burgoon positioned his vehicle to block the parking lot's exit. *Id.* Sergeant Cerutti arrived and positioned his vehicle so that the Acura and the Nissan could not back up. *Id.* at 26. Officer Burgoon's vehicle was "almost nose to nose" with the Acura. *Id.* at 26, 46. Appellee immediately fled from the passenger side of the Acura and was apprehended on foot by Officer Apostolu, who arrested him and conducted a pat-down search. *Id.* Officer Apostolu retrieved a baggie of marijuana and $1,800.00 in cash from Appellee's person. *Id.* The remaining vehicle occupants were ordered out and handcuffed. *Id.* at 47, 49-50.

From the front passenger-side floor of the Acura, police recovered a bag containing packaged marijuana, packaging materials and a scale. *Id.* at 30-31, 51. A bag recovered from the backseat contained marijuana and Adderall. *Id.* at 32, 52. A Smith and Wesson nine-millimeter handgun— later determined to be stolen—was recovered from the glove box. *Id.* at 29. A clear baggie with marijuana was recovered from the center console. *Id.*

_____

[3] Officer Apostolu did not testify, and his first name is not evident in the record.

- 4 -

at 51. The Acura belonged to the driver's mother. *Id.* at 33-34. A third individual—a juvenile—was in the Acura's back seat. *Id.* at 34.

After his arrest, the Commonwealth charged Appellee with possession of a controlled substance (marijuana), possession with intent to deliver a controlled substance (marijuana), conspiracy, unlawful possession of a firearm, and possession of an instrument of crime at docket number CP-51-CR-0012538-2013.[4] In connection with the stolen handgun recovered from the Acura's glove box, the Commonwealth also charged Appellee with robbery, theft by unlawful taking, receiving stolen property, conspiracy, unlawful possession of firearms, assault, recklessly endangering another person, and terroristic threats at docket number CP-51-CR0015450-2013.[5] By order of April 2, 2014, Judge Paula Patrick granted Appellee's motion to suppress evidence at number 12538. The same evidence is at issue in number 15450, and the Commonwealth conceded that it was collaterally estopped from challenging Appellee's motion to suppress at number 15450. By order of May 15, 2014, Judge Earl W. Trent, Jr. entered an order granting Appellee's motion to suppress at number 15450. We have *sua sponte*

---

[4] 35 P.S. § 780-113(16) and (30), 18 Pa.C.S.A. §§ 903, 6105, 6106 and 907, respectively.

[5] 18 Pa.C.S.A. §§ 3701, 3921, 3925, 903, 6105, 6106, 2701, 2705, and 2706, respectively.

consolidated these cases for appeal, as they involve precisely the same facts and legal issues.[6]

The Commonwealth filed timely notices of appeal in both cases pursuant to Pa.R.A.P. 311(d). Neither trial judge ordered the Commonwealth to file a concise statement of errors pursuant to Pa.R.A.P. 1925(b). The Commonwealth raises two issues for our review:

> I. Did the lower court err in suppressing drugs, a gun, and other evidence found in a car where [Appellee] failed to prove a reasonable expectation of privacy in the car?
>
> II. Did the lower court err in suppressing drugs, a gun, and other evidence found in a car where police observed conduct that resembled prior drug transactions within their experience and [Appellee] fled when police stopped the car?

Commonwealth's Brief at 4.

We review an order granting a defendant's suppression motion as follows:

> This Court is bound by those of the suppression court's factual findings which find support in the record, but we are not bound by the court's conclusions of law. When the suppression court's specific factual findings are unannounced, or there is a gap in the findings, the appellate court should consider only the evidence of the prevailing suppression party (here, appellee) and the evidence of the other party (here, the prosecution) that, when read in the context of the entire record, remains uncontradicted.

---

[6] **See** Pa.R.A.P. 513, governing consolidation of multiple appeals.

***Commonwealth v. Millner***, 888 A.2d 680, 685 (Pa. 2005). The suppression court's findings of fact are dependent upon its credibility determinations. ***L.J.***, 79 A.3d at 1085. "[O]ur standard of review is highly deferential with respect to the suppression court's factual findings and credibility determinations." ***Id.*** at 1080 n.6.

In its first argument, the Commonwealth asserts that Appellee had no reasonable expectation of privacy in the Acura and therefore no standing to seek suppression of any evidence recovered from the vehicle. In its second argument, the Commonwealth asserts that the record does not support the trial court's findings of fact. We find it useful to address these issues in reverse order so that we can conduct our legal analysis after a thorough assessment of the record and the trial court's findings.

At the conclusion of the suppression hearing, the trial court granted Appellee's motion to suppress because it disbelieved the Commonwealth's witnesses:[7]

> Officer Burgoon testified to things which I didn't believe. I thought it was hard for me to believe certain things about him testifying with 45 feet away with a naked eye that he was able to see, quote, this transaction, and I asked him about that. He then began to kind of sort of explain. That's not sufficient under the law, but I had a difficult time in believing some of the things he said.

N.T. Hearing, 4/24/14, at 68.

---

[7] The hearing addressed the joint motion of Appellee and his co-defendant, the driver of the Acura.

In her findings of fact, the trial court noted that the PARS report did not describe a hand-to-hand drug transaction between Appellee and the Nissan driver, merely a conversation. Trial Court Opinion, 8/13/14, Findings of Fact ¶ 9. The court found Officer Burgoon's account of the hand-to-hand transaction not credible. *Id.* Officer Burgoon made the observations "from **nearly 45 feet away** at around 7:30 p.m. without the aid of any binoculars or night vision. *Id.* at Findings of Fact ¶ 14 (emphasis in original). "This Court had a difficult time believing that the officer was able to make out such observations in the dark of night nearly 50 feet from where the defendants were located." *Id.* at Findings of Fact ¶ 15. "The [PARS] report for this incident does not indicate that Officer Burgoon ever witnessed any cupping of the hands or a hand to hand transaction take place in the parking lot." *Id.* at Findings of Fact ¶ 23. "It states that [Appellee] opened the Passenger door and leaned in and had a brief conversation with [the Nissan's driver]." *Id.* "Further, Officer Burgoon did not tell [Sergeant Cerutti] that he observed a cupping motion or anything like that in his report to his supervisor." *Id.*

The trial court thus chose to credit the facts as stated in the PARS report. *Id.* at Findings of Fact ¶ 24. The court did not credit Officer Burgoon's observations of the alleged hand-to-hand drug transaction, in part because his view was "obscured." *Id.* In summary:

> [N]othing of significance was ever really observed. The officers simply witnessed people talking in a parking lot near

their vehicles. This Court did not believe that any officer could have observed any alleged hand to hand transaction take place from nearly fifty feet away, yet alone from that vantage point at night. It would be next to impossible to see such movement from that distance at night without the aid of binoculars or night vision. In addition, the PARS did not state that the officers witnessed any such thing. This Court did find that the officers were conducting surveillance. This Court also determined that the officers had observed the suspects talking in a parking lot. But those are the only facts which the Commonwealth clearly established at the hearing.

*Id.* at 14.

The Commonwealth argues the record does not support the trial court's finding that Officer Burgoon made his observations in the dark of night. As set forth above, the suppression transcript indicates that this incident occurred shortly after 8:00 p.m. on June 1, 2013. The trial court discredited Officer Burgoon's testimony in part because it did not believe he could observe a drug transaction from 50 feet away in the "dark of night" without binoculars or night vision. Since this incident occurred around 8:00 p.m. on June 1, we agree with the Commonwealth that the record does not support the trial court's finding that the incident occurred in the "dark of night."[8]

_____

[8] The record contains no evidence of whether the sky was cloudless, severely overcast, or anything in between. The record also does not support the trial court's finding that the arrest occurred at 7:30 p.m. As set forth in our summary of the suppression transcript, Sergeant Cerutti testified that the surveillance commenced at 7:30 p.m. and Officer Burgoon testified that the arrest occurred shortly after 8:00 p.m. Regardless of this discrepancy,
*(Footnote Continued Next Page)*

Nonetheless, the "dark of night" finding was not the trial court's only basis for disbelieving Officer Burgoon's account of the hand-to-hand transaction. The trial court also relied on the PARS report. The PARS report prepared shortly after the incident described conversation between Appellee and the driver of the Nissan but not a hand-to-hand transaction. Thus, the record contains evidence supporting the trial court's finding that Appellee and the Nissan driver engaged only in conversation. Pursuant to the applicable standard of review, that finding is binding on this Court.

The Commonwealth argues that police were justified in stopping the vehicles and arresting Appellee even if Officer Burgoon observed only a conversation between Appellee and the Nissan driver. The Commonwealth relies on the procession from McDonald's to the 7-11 in accord with the common practice of drug transactions at that location, the brief conversation between Appellee and the Nissan driver, both cars moving to depart from the 7-11 parking lot with no vehicle occupant having entered the store, and Appellee's immediate flight upon the appearance of the police. The Commonwealth argues that police had at least reasonable suspicion to stop the Acura and Nissan as they were leaving the 7-11 parking lot and probable cause to arrest Appellee in light of his flight from a lawful detention.

Our courts recognize three levels of police interaction.

*(Footnote Continued)* ————————————

the record does not support a finding that the arrest occurred in the dark of night.

- 10 -

The first of these is a 'mere encounter' (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an 'investigative detention' must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or 'custodial detention' must be supported by probable cause

*Com. v. Lyles*, 54 A.3d 76, 79 (Pa. Super. 2012) *affirmed*, 97 A.3d 298 (Pa. 2014).

The Commonwealth argues that even if we conclude the record supports the trial court's findings, the stop of the vehicles was an investigative detention supported by reasonable suspicion.[9] We discern the existence of reasonable suspicion according to the following strictures:

Regarding the stop, a police officer may, short of an arrest, conduct an investigative detention if he has a reasonable suspicion, based upon specific and articulable facts, that criminality is afoot. The fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate. This assessment, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability.

*Com. v. Zhahir*, 751 A.2d 1153, 1156-57 (Pa. 2000) (internal citations and quotation marks omitted). "In conducting a reasonable suspicion inquiry, a suppression court is required to 'afford due weight to the specific, reasonable

---

[9] The Commonwealth also argues it had probable cause to support the warrantless arrests. Commonwealth's Brief at 18-19. In light of our disposition of this case, we need not address that issue.

inferences drawn from the facts in light of the officer's experience.'"
***Commonwealth v. Carter***, 105 A.3d 765, 775 (Pa. Super. 2014) (*en banc*).

We cannot conclude that the facts before us, as found by the trial court, evince reasonable suspicion in support of the vehicle stop. The evidence deemed credible by the suppression court indicates that two vehicles proceeded from a McDonald's parking lot to a 7-11 parking lot where Appellee stepped out of one vehicle and conversed with the driver of the other. The suppression court did not credit testimony indicating that that Appellee did anything more than engage in conversation. We are cognizant that Sergeant Cerutti testified to making hundreds of arrests in the vicinity of the McDonald's and 7-11, which had been a hot spot for three years. N.T. Hearing, 4/2/14, at 9-10. The suppression court apparently did not credit Sergeant Cerutti's testimony, as the court noted that the PARS report contained no mention of a pattern of narcotics activity at that location. Trial Court Opinion, 8/13/14, Findings of Fact ¶ 36. Rather, the suppression court found as fact that police acted based on a conversation in a parking lot and nothing more. ***Id.*** at ¶ 37. The court disbelieved much of the Commonwealth's evidence because several officers testified to facts that were omitted from and/or inconsistent with the contemporaneous arrest report. We must be highly deferential to the suppression court's credibility determinations. ***L.J.***, 79 A.3d at 1080 n.6.

Under these circumstances, we cannot conclude that the police had reasonable suspicion to support an investigative detention of the Nissan and Acura and their occupants. The United States Supreme Court has held that a vehicle stop constitutes a seizure of all persons inside the vehicle. **Brendlin v. California**, 551 U.S. 249, 251 (2007). Thus, all occupants of the vehicle have standing to challenge the constitutionality of the stop. **Id.** Pursuant to Pennsylvania law, any possessions Appellee abandoned in the Acura are subject to suppression because police lacked reasonable suspicion to detain Appellee. **Commonwealth v. Matos**, 672 A.2d 769 (Pa. 1996). Specifically, the **Matos** Court held that where police lack at least reasonable suspicion to detain a suspect, any property that suspect discards during flight is subject to suppression. **Id.**

Applying the foregoing law to the record, in light of the suppression court's findings of fact and credibility determinations, is a simple matter. The Commonwealth did not produce enough credible evidence to support a conclusion that police had reasonable suspicion to detain the vehicle in which Appellee was a passenger.[10] As such, the trial court did not err in suppressing all of the evidence retrieved from the vehicle and from Appellee's person after his arrest. We therefore affirm the trial court's order.

_____

[10] Given our analysis, we need not discern whether Appellee had a reasonable expectation of privacy in the vehicle.

- 13 -

Order affirmed.

P.J.E. Ford Elliott files a concurring statement in which Judge Stabile and Justice Fitzgerald join.

Justice Fitzgerald concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/21/2015